## SYSTEMS DEVELOPMENT CORPORATION

v.

### The UNITED STATES.

#### No. 164–75.

United States Court of Claims.

March 17, 1976.

Eldon H. Crowell, Washington, D. C., attorney of record for plaintiff, Richard McMillan, Jr., W. Scott Ferguson, Jones, Day, Reavis & Pogue, Washington, D. C., Bernard Fried and Joseph D. Frascella, Santa Monica, Cal., of counsel.

Thomas J. Scott, Jr., with whom was Asst. Atty. Gen., Rex E. Lee, Washington, D. C., for defendant; Richard J. Riseberg, and William G. Ketterer, Laurel, Md., of counsel.

Before DAVIS, NICHOLS and KASHIWA, Judges.

NICHOLS, Judge.

This case is put before us by means of defendant's motion for summary judgment. There is no cross motion. Plaintiff (hereinafter SDC), a developer and marketer of computer programs ("computer software") furnished to the National Library of Medicine (NLM) a system known as ORBIT un-

der a contract including a license to use that system with limitations. SDC says NLM has breached the limitations. NLM denies it. The issue mainly turns on a disputed interpretation of the limitation language. We see no issues of fact requiring trial. We hold for defendant and dismiss the petition.

NLM's library includes a mass of data called MEDLARS stored in computer tapes. ORBIT is not data itself, but an "information retrieval system" that enables the user to gain access to MEDLARS data. The contract was awarded in 1971. Since then, users outside NLM itself, hospitals, universities etc., have been put "on line" and via commercial telecommunication facilities they can put questions to the MEDLARS tape and receive answers with the help of the ORBIT system. Until 1975, privately owned pharmaceutical houses, operated for profit, were not allowed to avail themselves of the same service because of a lack of computer facilities in NLM. In January 1975, however, NLM, having more computers, made the same facilities available to these commercial houses. SDC says this is a breach of a license commitment by NLM not to operate a "computer service bureau", and takes away customers who would otherwise deal directly with SDC, to the damage of SDC in the amount of $4,124,472. Apparently, up to 1975 the pharmaceutical houses purchased services from plaintiff via their trade association. A second count alleges an uncompensated Fifth Amendment taking, but the motion does not deal with it separately. With either count, the problem is construction of contract language, asserted by each side to be clear in its favor, and actually, as murky as language can well be.

The disputed language reads:

The National Library of Medicine agrees not to utilize licensed material in the performance of computer service bureau operations nor performance of any services for third parties except within its mission as established by law or regulation. (Punctuation as above; no commas).

SDC proposed this clause in its initial offer and NLM objected that it was too restrictive. It then lacked the words beginning with "except". NLM suggested adding these words, and this was done before signature. In this final form, the language is ambiguous in a very primitive way, in that grammatically, the word "except" and what follows it may modify the whole sentence, or only "performance of any services for third parties". NLM urges the former, SDC the latter. The question may be stated as: May NLM perform "computer service bureau operations" if they are within its "mission", or not at all? The way the exception was added supports the idea that it modifies the whole sentence, but that is not the only reason for thinking so. Someone put brackets around the whole sentence in SDC's draft and wrote "delete?" in the margin. This appears in SDC's copy of its submission as attached to its opposition to the motion. It cannot but reflect NLM's initial reaction to the offer as noted by someone in SDC. It is obvious the exception was added as a substitute for deletion of the entire sentence as proposed at first.

The Library considers its mission to be stated in 42 U.S.C. § 275, et seq., as implemented in regulations. While the Library is nominally for "the public" the Director is to limit the general public to the extent necessary to insure the most "effective use" by "health science professionals" defined in 42 C.F.R. § 4.3, as:

\*     \*     \*     \*     \*     \*

(f) \* \* \* any person engaged in the administration of health activities, the provision of health services, or in research, teaching or education concerned with the advancement of medicine or other sciences related to health or improvement of the public health.

\*     \*     \*     \*     \*     \*

Defendant's brief says, justly, that employees of the research arms of pharmaceutical firms fall within this definition. SDC, which had much other business with NLM, cannot but have known that the exclusion of such firms from "on line" access to MEDLARS was atypical, while it lasted

since otherwise they enjoyed full use of the Library facilities, including its computer tapes. SDC's alternative argument that the practice adopted in January 1975, was outside the "mission" is too weak to consider further.

The parties invite our attention to the meaning of "computer service bureau operations". They seem to agree, pretty much, that it is the same as "performance of any service for third parties" except that it is always done for pay while the other may be gratuitous. The record includes one outside, impartial definition:

> *Service bureau.* An organization that leases or sells computer time, manpower, or other computational support to the public: Sondak. *The Layman's Dictionary of Computer Terminology.* Hawthorn Books, Inc., undated.

The record is somewhat obscure but apparently the NLM charges for the services here involved on an hourly basis, but below their real cost. Apparently profit and non-profit institutions pay at the same rates. In explaining how this became "computer service bureau operations" in January 1975, and not before, SDC states lamely that the profit derived from their activities by the pharmaceutical houses is somehow imputed to NLM. The activity still utterly fails to meet the definition. If NLM ever functioned as a "computer service bureau" it did so before January 1975, as much as after, yet SDC concedes as it must, there was nothing unlicensed in what NLM did for hospitals, universities, etc., before that date.

SDC's case thus fall flat on its face three times: it fails to show that the "except" part of the license limitation does not except "computer service bureau operations" whatever they are, if within the NLM mission; it fails to show the services to pharmaceutical houses here involved are outside the mission, as conceived and published by the Library at the time the contract was awarded; and it fails to show that the services involved are "computer service bureau operations" if rendered to pharmaceutical houses, though not when rendered to hospitals and universities. If at the time of contract negotiations SDC had really adverted to the pharmaceutical houses, knowing as it must have that they were regular users of the Library's other services, and really intended to exclude them (though not, apparently, profit making hospitals of which there are plenty) they should have said or written something to make their intentions clear. The Library would naturally not expect a contractor to demand a stoppage of what it considered part of its normal mission, and one who did would be expected to make his intentions clear, at least. This plaintiff did not do. NLM introduced ORBIT into its computer system without any notice that it was thereby cutting off a class of its regular users.

Upon review of the briefs and record, but without oral argument, defendant's motion for summary judgment is allowed and the petition is dismissed.